IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

CHARLES DOE,                          :
                                      :
          Plaintiff,                  :
                                      :
vs.                                   :      5:04-CV-172 (DF)
                                      :
GENE A. SCROGGY, Warden, et al.,      :
                                      :
          Defendants.                 :

## O R D E R

## I.    INTRODUCTION

On June 3, 2004, John Doe, Charles Doe ("Plaintiff"), and James Doe, all former

inmates at Frank C. Scott, Jr. State Prison[1] ("Scott Prison"), instituted separate § 1983

actions[2] against nine Georgia Department of Corrections ("GDOC") officials in their

individual and official capacities: (1) Gene Scroggy, Warden of Scott Prison; (2) Aubrey

Jones, Deputy Warden of Security for Scott Prison; (3) Tom McElhenney, Deputy Warden

of Care and Treatment for Scott Prison; (4) Gloria Nicholson (n/k/a Gloria Chester), a

supervisory correctional officer at Scott Prison; (5) Captain Carl Evans, a supervisory

---

[1] Scott Prison is located in Hardwick, Georgia.

[2] *See* civil action numbers 5:04-cv-171 (DF) and 5:04-cv-173 (DF).

correctional officer at Scott Prison; (6) Sergeant Dennis Holsey, a supervisory correctional officer at Scott Prison; (7) Sergeant Dennis Knight, a supervisory correctional officer at Scott Prison; (8) Ray Stanelle, an investigator in the GDOC's Internal Investigations Division; and (9) Johnny McCurry, Director of the Internal Investigations Division ("Defendants").  In the instant action, Charles Doe charges Defendants with violations of the Eighth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, and enforced through 42 U.S.C.A. § 1983 (West 2005).

Before this Court is Defendants' Motion for Summary Judgment (doc. 34).  For the reasons stated below, Defendants' summary-judgment motion is **GRANTED IN PART**, and **DENIED IN PART**.

## II.    STANDARD OF REVIEW

The summary-judgment rule exists "to isolate and dispose of factually unsupported claims or defenses."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (West 2005); *see also* **Celotex Corp.**, 477 U.S. at 322.  A genuine

issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, a court must review all the evidence in the record while "draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also* *Maynard v. Williams*, 72 F.3d 848, 851 (11th Cir. 1996).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and entitle it to a judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted). If the moving party discharges this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324-26. This evidence must

consist of more than mere conclusory allegations or legal conclusions.  *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).  Under this scheme, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## III.    FACTUAL BACKGROUND

In 1984, a group of inmates sued the GDOC, challenging "a broad spectrum of unconstitutional conduct" by the GDOC and its employees.  (Pl.'s Resp. Defs.' Mot. Summ. J., doc. 76, at 3; *see Cason v. Seckinger*, Civil Action No. 5:84-CV-313-1 (M.D. Ga. 1984)).  The action was largely resolved through a series of consent orders[3] aimed at curing the alleged "constitutional deficiencies."  (Pl.'s Resp. 3.)  Pursuant to the consent decrees, the GDOC adopted certain standard operating procedures (SOPs) designed to address and remedy the perceived deficiencies.  (Pl.'s Resp. 4.)  In particular, the GDOC implemented several SOPs that outlined the procedures for employees to follow when confronted with an inmate's allegation of sexual abuse, assault, or misconduct by another inmate or a staff member.  For example, SOP IK01-0007 requires staff members who learn of an incident of

---

[3] The consent decrees were entered between May 10, 1990, and March 29, 1996.  *See Cason v. Seckinger*, 231 F.3d 777, 778 (11th Cir. 2000).

sexual abuse, assault or misconduct to immediately notify the warden or the institutional duty officer, or both.  (Pl.'s Dep., Ex. 5.)  The warden then must notify the appropriate regional or divisional director.  (Id.)  SOP IK01-0007 also  requires the warden to "ensure that mental health and medical assistance are immediately made available for the victim, including assistance which may be necessary throughout the course of the investigation." (Id.)

SOP VH85-0002 requires health care staff members to report sexual contact or abuse to the warden, and outlines the procedures to be followed upon learning of a sexual-abuse allegation.  (Pl.'s Dep., Ex. 6.)  In turn, prison officials are required to notify a health care staff member when an inmate makes a sexual-assault allegation, and the staff member must make arrangements for the inmate to undergo a medical evaluation.  (Id.)  Lastly, SOP VG01-0014 requires inmates who are suspected victims of sexual assault or abuse to receive a mental health evaluation and be referred for treatment, if necessary.  (Pl.'s Dep., Ex. 7.)  This SOP also requires any employee who becomes aware that an inmate has been sexually assaulted to notify the warden, the mental health manager, and appropriate medical authorities.  (Id.)  The *Cason* litigation ended in February 2002, but the SOPs implemented as a result of that litigation remain in place within the GDOC's correctional facilities.

With this background in mind, the Court turns to the factual allegations that are the basis of this suit.[4]  The constitutional violations alleged by Plaintiff arise out of a series of sexual assaults committed against Plaintiff and his fellow inmates, John Doe and James Doe, by a correctional officer named Nicholas Tuft[5] ("Tuft"), who was employed at Scott Prison during the inmates' incarceration at that facility.[6]  According to John Doe, Tuft sexually assaulted him on three different occasions between June 2002 and July 2002.  At the time of those assaults, Tuft was assigned to work in Holly E Hall, John Doe's dormitory at Scott Prison.

On July 10, 2002, following a slight altercation between Tuft and John Doe in Holly E Hall, Tuft accused John Doe of physically assaulting him.  When Sergeant Knight and other correctional officers confronted John Doe regarding Tuft's accusation, John Doe

---

[4] The essential facts of this case are not in dispute.  Even if the facts were disputed, this Court would still be under an obligation to "take the facts in the light most favorable to the party asserting the injury" both because this case is before the Court on Defendants' summary-judgment motion, *Reeves*, 530 U.S. at 150, and because Defendants have asserted qualified immunity.  *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005) ("[M]aterial issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment.")  The Court notes, however, that Defendants have "reserve[d] the right to contest Plaintiff's testimony in the event some or all of Plaintiff's claims survive summary judgment."  (Defs.' Br. Supp. Mot. Summ. J., doc. 34, Attach. 2, at 1 n.1.)

[5] Although Tuft was originally a named defendant in this action, the parties stipulated to his dismissal on May 4, 2005.

[6] "Prior to June 2002, Tuft had not been disciplined or reprimanded for any actions taken as a correctional officer while employed by the GDOC."  (Defs.' Br. 1.)

informed them about Tuft's sexual assaults.  After John Doe was briefly detained by the officers, he was placed in administrative segregation, where he later attempted to commit suicide.  Word about John Doe's allegations against Tuft traveled quickly among the inmates, some of whom speculated that the guards may have attempted to murder John Doe in retribution for those allegations.

Deputy Warden Aubrey Jones referred the John Doe matter to Warden Gene Scroggy on July 12, 2002.  Scroggy referred the matter to Regional Director Jimmy Sikes the same day.  On July 17, 2002, Sikes forwarded John Doe's allegations to Johnny McCurry, Director of Internal Investigations for the GDOC, for further review.  On July 30, 2002, the Tuft investigation was assigned to Investigator Ray Stanelle.[7]  Stanelle did not take any affirmative action on the matter until August 12, 2002, when he received word that Plaintiff had also accused Tuft of sexual assault and had provided the GDOC with semen-stained clothing.

Sometime before the end of July 2002, Tuft was transferred to Holly A Hall, the dormitory where Plaintiff and James Doe resided.  On or about July 27, 2002, shortly after Tuft assumed his duties in Holly A Hall, Plaintiff noticed Tuft observing him in the shower, and was fairly certain that Tuft winked at him.  When Plaintiff got out of the

_____

[7] Stanelle was not specially trained to investigate allegations of sexual assault.  (Pl.'s Resp. 17.)

shower, he put on a pair of shorts and went to the laundry room to get additional clothing. While Plaintiff was in the laundry room, Tuft approached him from behind, reached around him, and grabbed his penis. Plaintiff wheeled around to face Tuft and glared at him. Tuft responded by warning Plaintiff that, if he told anyone about the incident, the same thing that happened to John Doe could happen to him. Having heard the rumors surrounding John Doe's injuries and Tuft's alleged assaults, Plaintiff felt very threatened by Tuft's statement.

That day, Plaintiff returned to his bunk and wrote a letter to Captain Nicholson, the supervising officer of the Holly building, informing her about Tuft's misconduct. Plaintiff mailed the letter to Nicholson the next morning through the institutional mail system. Following the laundry room incident, Tuft continued his sexual advances towards Plaintiff by writing a series of sexually suggestive notes to him and leaving them in his bunk or in his locker. While Tuft made Plaintiff return three of the notes, Plaintiff kept a fourth note, which read: "J, I want you so damn bad it doesn't even make since [sic]. I know you might not believe this, but I think about you constantly and I wanna be with you, I won't stop until I get you. W/B soon. Why you so damn fine??" (Pl.'s Dep., Ex. 20.) When Plaintiff did not respond to any of Tuft's notes, Tuft became angry and, as Plaintiff indicated in a letter to Deputy Warden Jones dated July 31, 2002, after Tuft "assaulted" him in the

8

laundry room, Tuft talked about "fucking [him] up" because he would not respond to Tuft's notes, and "threatened to tell [Jones] that Plaintiff assaulted him and [Plaintiff would] get a life sentence because [he] already ha[d] violent crimes." (Pl.'s Dep., Ex. 12.)

Sometime in the late afternoon on or about August 2, 2002, Tuft directed Plaintiff to follow him to a room located adjacent to the "big TV room" in Holly A Hall. When the two entered the room, Tuft showed Plaintiff his penis and began masturbating. While this was occurring, Tuft reached over and touched Plaintiff's penis, over Plaintiff's shorts. When Tuft finished, he ejaculated on the front of Plaintiff's t-shirt and told Plaintiff to clean it up. During the incident, Tuft told Plaintiff not to tell anyone about their encounter, or he would claim that Plaintiff assaulted him and Plaintiff would "spend the rest of [his] life in prison." (Charles Doe Dep. 113.)

That same day, after 9:00 p.m., Tuft came to Plaintiff's bunk and told Plaintiff to follow him. Tuft led Plaintiff to the back porch area of Holly A Hall and told Plaintiff to sit down. Tuft then pulled his penis out of his pants and ordered Plaintiff to perform oral sex on him. When Plaintiff hesitated, Tuft again threatened to report Plaintiff for assault, then grabbed Plaintiff's head and forced him to comply with his request. When Plaintiff finished, Tuft ejaculated in Plaintiff's mouth and on Plaintiff's t-shirt. Plaintiff saved both the t-shirts on which Tuft ejaculated that day. Notwithstanding Tuft's threats, Plaintiff

wrote a letter to Warden Scroggy informing him about Tuft's assaults and mailed the letter the next morning.

Shortly after the August 2nd assaults, Plaintiff's grandmother visited him at Scott Prison.  During his grandmother's visit, Plaintiff gave her copies of the letters he had written to Defendants Jones and Scroggy, a piece of one of the semen-stained t-shirts he had saved, and a letter intended for Plaintiff's step-father, Ronald James ("James"). Plaintiff's grandmother delivered the letter to James, who visited Plaintiff the next day. During James's visit, Plaintiff informed James about Tuft's sexual assaults and told him that the t-shirt he had given to his grandmother contained Tuft's semen.

On Monday, August 12, 2002, James traveled to the offices of the GDOC in Atlanta, Georgia.   During his visit, he informed James Doctor ("Doctor"), the director of the GDOC's facilities division, about Plaintiff's allegations, and delivered to Doctor copies of the letters Plaintiff had written to Scroggy and Jones about the assaults, along with pieces of the t-shirt Plaintiff had given him.

Also on August 12, 2002, Investigator Ray Stanelle interviewed Plaintiff concerning his allegations against Tuft.  During the interview, Plaintiff claimed that, on the afternoon of August 2, 2002, Tuft masturbated in the TV room of Holly A Hall while holding Plaintiff's penis.  Plaintiff also alleged that Tuft forced Plaintiff to perform oral sex on him

on the back porch of Holly A Hall later that day.

Sometime between August 12, 2002, and August 16, 2002, Tuft was transferred to Men's State Prison ("MSP") in Hardwick, Georgia.  On August 16, 2002, Stanelle interviewed James Doe concerning his allegation that Tuft sexually assaulted him on July 30, 2002, and August 1, 2002.  While Stanelle was at Scott Prison that day, Plaintiff delivered the other semen-stained t-shirt in his possession to Stanelle.

After interviewing James Doe, Stanelle interviewed Tuft at MSP.  During the interview, Tuft denied Plaintiff's, John Doe's, and James Doe's allegations.  Tuft also declined to undergo a DNA test, choosing instead to tender his resignation.  On August 19, 2002, Scroggy recommended that Tuft "not be eligible for rehire by the Department of Corrections due to his resignation during the course of an investigation by internal affairs."  (Defs.' Br. 7.)

On August 23, 2002, Plaintiff and James Doe underwent mental-health evaluations at Scott Prison.

Stanelle interviewed John Doe concerning his sexual-assault allegations on September 3, 2002.  By Monday, September 9, 2002, Stanelle had completed his investigation into each inmate's sexual-assault allegations.  Before formally closing its investigation into Plaintiff's allegations, the Internal Investigations Division referred its

findings to the District Attorney's Office of Baldwin County, Georgia.  Shortly thereafter, the Georgia Bureau of Investigation ("GBI") began its inquiry into Plaintiff's, John Doe's, and James Doe's sexual-assault allegations.  On November 25, 2002, the GBI's Crime Lab confirmed the presence of seminal fluid on the t-shirts provided by Plaintiff.  On January 17, 2003, the GBI obtained a search warrant authorizing Special Agent Ryan Carmichael to obtain a DNA sample from Tuft.

On April 21, 2003, following a DNA analysis of Plaintiff's t-shirts, the GBI's Crime Lab concluded that the seminal fluid found on the t-shirts matched Tuft's DNA.  Tuft was arrested on April 25, 2003.  On November 19, 2003, Tuft was indicted by a Baldwin County grand jury on three charges of sexual assault against a person in custody, in violation of O.C.G.A. § 16-6-5.1.  Tuft subsequently pleaded guilty to all three counts of sexual assault.

## IV.   LEGAL DISCUSSION

### A. Official-Capacity Claims Under Section 1983

Each of the Defendants named in this action has been sued in his or her official capacity.  It is undisputed that all of the Defendants are (or were at the time of the events giving rise to Plaintiff's claims) employees of the State of Georgia.  It is similarly undisputed that the claims against each Defendant are actually claims against the State of Georgia, and that the State of Georgia is the real party in interest.  *See **Will v. Mich. Dep't***

*of State Police*, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity is . . . a suit against the official's office . . . [and] is no different from a suit against the State itself").

Section 1983 creates a cause of action against a *person* who, under color of law, deprives another person of his or her rights, privileges, or immunities secured by the Constitution or other federal statute.  42 U.S.C.A. § 1983 (West 2005) (emphasis added). The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983"; thus, neither a State nor a state official sued in his or her official capacity may be held liable in an action for damages brought pursuant to that section.  *Will*, 491 U.S. at 71.

Accordingly, because Plaintiff's official-capacity claims against Defendants are barred, Defendants are entitled to summary judgment on Plaintiff's official-capacity claims.

**B. Individual-Capacity Claims: Section 1983 and Qualified Immunity**

Plaintiff charges Defendants individually with violations of the Eighth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, and enforced through 42 U.S.C.A. § 1983.  Defendants argue that they are entitled to qualified immunity from Plaintiff's claims.

13

"To prevail in a civil rights action under 42 U.S.C.A. § 1983, a plaintiff must show that the defendant, under color of state law, deprived the plaintiff of a right secured by the Constitution and laws of the United States." *Barfield v. Brierton*, 883 F.2d 923, 934 (11th Cir. 1989). "Section 1983 alone creates no substantive rights; rather it provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Id.* "An underlying constitutional right must exist before a § 1983 action will lie." *Id.*

Although § 1983 creates a cause of action against state actors, a state actor acting within the scope of his or her official duties at the time of the alleged constitutional violation nonetheless may be entitled to qualified immunity from such an action. Qualified immunity shields a government official performing discretionary functions from liability for civil damages unless the performance of such functions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *McElligott v. Foley*, 182 F.3d 1248, 1260 (11th Cir. 1999) (citations and internal quotation marks omitted).

To be eligible for the protection of qualified immunity, a state official must prove that he was performing a discretionary function "when the allegedly wrongful act occurred." *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988). If the official satisfies this threshold inquiry, the burden shifts to the plaintiff to demonstrate "that the defendant

14

public official's actions 'violated clearly established constitutional law.'" *Id.* (quoting

*Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)).

Once a state official satisfies his initial burden, courts employ a two-step analysis to determine whether or not the official is entitled to qualified immunity. The first inquiry is whether the official violated a constitutional right. If a constitutional violation is found, the court will then determine whether the constitutional right was clearly established at the time of the violation. *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).

Plaintiff alleges that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment in two respects. First, Plaintiff claims that Defendants' failure to provide "immediate medical [treatment] and [a] mental health evaluation" when informed of Plaintiff's sexual-assault allegation constituted deliberate indifference to his serious medical needs. Second, Plaintiff asserts that Defendants' failure to ensure that Tuft no longer had access to inmates following John Doe's allegations constituted deliberate indifference to Plaintiff's right to be protected from sexual assault while incarcerated. The Court will analyze Defendants' assertions of qualified immunity in the context of each claim below.

## 1.    MEDICAL AND MENTAL-HEALTH TREATMENT CLAIM

Before engaging in the qualified-immunity analysis, the Court must first determine

whether Defendants were performing discretionary functions when the alleged constitutional violations occurred.

### a. Discretionary Authority

A defendant's actions are deemed to be within the scope of his or her discretionary authority if "objective circumstances . . . compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich*, 841 F.2d at 1564 (internal quotation marks omitted).

Because Plaintiff alleges that Defendants breached their supervisory duties relating to his conditions of confinement at Scott Prison, the Court finds that Defendants were exercising their discretionary authority as prison officials when the wrongful conduct giving rise to Plaintiff's claims arose. Thus, Defendants are entitled to seek the protection of qualified immunity. To overcome Defendants' assertions of qualified immunity, Plaintiff must show that Defendants' conduct violated his clearly established constitutional rights.

### b. Qualified Immunity

### (i) Has Plaintiff Alleged a Constitutional Violation?

Plaintiff alleges that he should have received a mental-health evaluation and psychiatric treatment immediately after he notified Defendants about Tuft's assaults.

16

Tuft's most serious sexual assaults allegedly occurred on August 2, 2002, but Plaintiff did not receive a mental-health evaluation until August 23, 2002.  According to Plaintiff, Defendants' delay in administering the mental-health evaluation violated his Eighth Amendment right to adequate psychiatric treatment.  Thus, the relevant issue here is whether Defendants' delay in providing Plaintiff a mental-health evaluation violated his Eighth Amendment right to adequate and timely psychiatric treatment.

"Prisoners are guaranteed the right under the Eighth Amendment to be free from deliberate indifference by correctional institutions to their serious physical or psychological needs."  *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  "In this circuit, it is established that psychiatric needs can constitute serious medical needs and that the quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to those serious psychiatric needs."  *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996).

Delay in providing medical treatment to an inmate can also constitute deliberate indifference when the delay results in the "unnecessary and wanton infliction of pain."  *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (citation and internal quotation marks omitted), *abrogated on other grounds*, *Hope v. Pelzer*, 536 U.S. 730 (2002).  To establish that a delay in medical treatment constituted deliberate indifference,

17

Plaintiff must "place verifying medical evidence in the record" to demonstrate the harmful effects of the delay in treatment. *Id.* at 1188. "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." *Harris v. Coweta County*, 21 F.3d 388, 393-94 (11th Cir. 1994). "Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay." *Hill*, 40 F.3d at 1188-89.

Even if this Court were to assume that Plaintiff had an Eighth Amendment right to a mental-health evaluation and psychiatric treatment following his sexual-assault allegation, Defendants' delay in providing this treatment did not result in an Eighth Amendment violation. Plaintiff does not allege that Defendants intentionally or wantonly denied him a mental-health evaluation or psychiatric treatment with specific knowledge that Plaintiff would suffer psychological harm if he did not immediately receive this treatment. At most, Plaintiff alleges negligence on the part of Defendants for the delay of twenty-one days between his sexual-assault allegation and his mental-health evaluation. Such a delay, absent proof that Defendants purposefully denied Plaintiff psychiatric treatment with the intent to cause him harm or in callous disregard for his mental health, does not meet the standard for deliberate indifference under the Eighth Amendment.

18

Moreover, Plaintiff has not placed any verifying medical evidence in the record to demonstrate the harmful effects, if any, attributable to the delay in treatment.  Thus, Plaintiff has not alleged a constitutional violation, and Defendants are entitled to summary judgment on Plaintiff's mental-health claim.  Notwithstanding the Court's foregoing conclusion, the Court will continue its qualified-immunity analysis and address Plaintiff's argument that his right to immediate psychiatric treatment was clearly established when he reported Tuft's assaults.

**(ii) Was Plaintiff's "Right" to Immediate Psychiatric Treatment Clearly Established?**

Even if Plaintiff established that he had an Eighth Amendment right to mental-health and medical treatment immediately following his sexual-assault allegations, and that Defendants violated this right by delaying Plaintiff's treatment, the Court cannot conclude that the right was clearly established when the assaults occurred.

Plaintiff contends that Defendants' knowledge of the assault allegations, and their collective failure to provide immediate mental health and medical treatment to Plaintiff evidences their conscious decision to violate Plaintiff's Eighth Amendment right to immediate treatment.  Plaintiff further contends that, at the time of the alleged deprivations, "the unlawfulness of the Defendants' actions against the Plaintif[f] was most

19

definitely apparent." (Pl.'s Br. 50.)

A constitutional right is "clearly established" if "'[t]he contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *McElligott*, 182 F.3d at 1260 (quoting *United States v. Lanier*, 520 U.S. 259, 270 (1997)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Court's research has not revealed any case which would have informed Defendants that the Eighth Amendment required them to order a mental-health evaluation and treatment for Plaintiff immediately upon being notified of his sexual-assault allegations, and that their failure to do so within a prescribed period of time would subject them to individual liability under the Eighth Amendment and 42 U.S.C.A. § 1983. While the absence of precedent establishing the alleged violation as unconstitutional does not bar this Court from finding that a constitutional right was clearly established, the Court cannot conclude that, in light of preexisting law dealing with a prisoner's right to psychiatric care, a reasonable prison official would recognize that a sexual-abuse allegation alone carries with it an Eighth Amendment right to an immediate mental-health

evaluation or psychiatric treatment or both.  *Cf. **Greason v. Kemp***, 891 F.3d 829, 834-36 (11th Cir. 1990) (recognizing inadequate psychiatric care could violate inmate's Eighth Amendment rights where director discontinued inmate's anti-depression medication despite information in inmate's clinical file which indicated inmate was suicide risk if not on anti-depressant medication); ***Waldrop v. Evans***, 871 F.2d 1030, 1033 (11th Cir. 1989) (psychiatrist's abrupt discontinuation of inmate's psychotropic medication despite evidence of inmate's history of psychiatric illnesses could constitute deliberate indifference); ***Steele***, 87 F.3d at 1269 (same).

Accordingly, because Plaintiff did not have an Eighth Amendment right to mental-health treatment immediately following his sexual-abuse allegation, and because, even if such a right existed, it was not clearly established at the time of Defendants' alleged constitutional violations, the Court hereby finds that Defendants are entitled to qualified immunity from, and summary judgment on, Plaintiff's mental-health claim.

## 2.    FAILURE-TO-PROTECT CLAIM

### a. Discretionary Authority

The facts clearly demonstrate that Defendants were exercising their discretionary authority as prison officials when the circumstances giving rise to Plaintiff's failure-to-protect claim arose.  Thus, Defendants are entitled to seek the protection of qualified

immunity.   To overcome Defendants' assertions of qualified immunity, Plaintiff must show that Defendants' conduct violated his clearly established constitutional right(s).

**b. Qualified Immunity**

**(i) Has Plaintiff Alleged a Constitutional Violation?**

Plaintiff alleges Defendants' failure to prohibit or otherwise restrict Tuft's access to the general inmate population once they were informed of John Doe's sexual-assault allegations against Tuft amounted to deliberate indifference to Plaintiff's Eighth Amendment right to be free from sexual assault while incarcerated.

Prison officials have an obligation under the Eighth Amendment to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and *must take reasonable measures to guarantee the safety of the inmates*."  ***Farmer v. Brennan***, 511 U.S. 825, 833 (1994) (citations and internal quotation marks omitted) (emphasis added); *see* ***Hudson v. Palmer***, 468 U.S. 517, 526-27 (1984) (Prison administrators are, at minimum, "under an obligation to take reasonable measures to guarantee the safety of the inmates themselves.").  "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." ***Farmer***, 511 U.S. at 834 (citations and quotation marks omitted).  More specifically, the sexual abuse of a prisoner by a correctional officer "serves no legitimate penological objectiv[e], any more than it squares with evolving standards

of decency." *See id.*

"It is not, however, every injury suffered by one prisoner . . . that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* "A prison official violates the Eighth Amendment only when two requirements are met." *Id.* First, "the deprivation alleged must be objectively, sufficiently serious." *Id.* When a claim is "based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.*

Second, the inmate must establish that the prison official knew of, and disregarded, "an excessive risk to inmate health or safety." *Id.* at 837. To satisfy this requirement, the inmate must show that the official was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that the official drew the inference. *Id.* Moreover, "the known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citations and internal quotation marks omitted).

"When officials become aware of a threat to an inmate's health and safety, the Eighth Amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection." *Id.*; *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1027

23

(11th Cir. 2001).   But, an official's duty to protect an inmate only extends to those situations in which the official had a realistic opportunity to prevent or correct the illegal conduct.  *See Ensley v. Soper*, 142 F.3d 1402, 1407-08 (11th Cir. 1998); *Valdes v. Crosby*, 390 F. Supp. 2d 1084, 1105 (M.D. Fla. 2005), *aff'd*, 450 F.3d 1231 (11th Cir. 2006) .

As an initial matter, the Court will address Plaintiff's allegations against Defendants Ray Stanelle, an investigator in the GDOC's Internal Investigations Division, and Johnny McCurry, Director of the Internal Investigations Division.  Plaintiff alleges that Stanelle and McCurry should be held liable for their failure to prevent Tuft's assaults because they did not limit or prevent Tuft's access to inmates upon learning of John Doe's sexual-assault allegation.

While Stanelle and McCurry can, under Plaintiff's version of the facts, be properly charged with notice of John Doe's sexual-assault allegation against Tuft, whether Stanelle and McCurry were under a constitutional duty to take steps to abate the risk posed by Tuft is a close question.  McCurry and Stanelle were not employed at Scott Prison when Tuft's assaults on Plaintiff took place.   Rather, as employees of the GDOC's Internal Investigations Division, McCurry's and Stanelle's duties included, respectively, assigning and completing investigations into allegations of inmate abuse within the GDOC.  Though the timing of McCurry's assignment of, and Stanelle's investigation into, John Doe's

24

allegation may leave open the questions of whether these Defendants could have acted more quickly and whether John Doe's allegations could have been substantiated sooner, these facts alone are insufficient to create liability on the part of McCurry or Stanelle. Unlike the other Defendants, who were specifically charged with the governance and administration of Scott Prison, McCurry and Stanelle were charged with investigating incidents of inmate abuse within the GDOC and reporting their findings to others. Thus, because there is no evidence suggesting that McCurry and Stanelle had the authority or a meaningful opportunity to prevent Tuft's subsequent assaults on Plaintiff, Defendants Stanelle and McCurry are entitled to summary judgment on Plaintiff's failure-to-protect claim. *See **Davidson***, 474 U.S. at 347-48; ***Valdes***, 390 F. Supp. 2d at 1105. The Court will now address Plaintiff's failure-to-protect claim against the remaining Defendants.

**Was Plaintiff Incarcerated Under Conditions Posing a Substantial Risk of Serious Harm to Him?**

It is undisputed that Tuft was allowed to remain in his position as a prison guard following John Doe's allegation of sexual assault. It is similarly undisputed that, had Tuft not been granted virtually unrestricted access to the inmates, Plaintiff likely would not have been sexually assaulted by Tuft.

Viewing the summary-judgment evidence in the light most favorable to Plaintiff,

the Court finds that Plaintiff has established an objectively, sufficiently serious constitutional deprivation. Because Tuft was permitted to continue working with inmates even after being accused of sexual assault, Plaintiff, as an inmate under Tuft's direction and control, was incarcerated under conditions posing a substantial risk of serious harm to him.

The Court's inquiry does not end here, however. Plaintiff still must demonstrate that Defendants were both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that Defendants drew the inference.

**Did Defendants Know of, and Disregard, an Excessive Risk to Plaintiff's Health or Safety?**

Plaintiff alleges each Defendant knew of, and disregarded, an excessive risk to his safety. According to Plaintiff, Defendants knew that Tuft posed a threat to other inmates because John Doe, another inmate, accused Tuft of sexual assault only one month before Tuft assaulted Plaintiff.[8] Yet, Defendants allegedly ignored the risk posed by Tuft, and did

---

[8] Plaintiff argues that the letters he wrote to Defendants Nicholson and Jones about Tuft's sexual misconduct prior to the August 2, 2002 assaults also gave Defendants notice of the threat posed by Tuft. This argument is rejected. Tuft's misconduct before August 2nd (e.g. groping Plaintiff and writing him sexually suggestive notes), while deplorable, did not rise to the level of Eighth Amendment violations necessitating a response by Defendants. *See Boxer X v. Harris*, 437 F.3d 1107, 1111 (11th Cir. 2006) (female prison guard's solicitation of inmate's manual masturbation presented *de minimis* injury and was not actionable under Eighth Amendment); *see also Boddie v. Schneider*, 105 F.3d 857, (2d. Cir. 1997) (inmate's allegations that he was verbally harassed, touched, and pressed against without his consent on several occasions were not objectively, sufficiently

not take any steps to ensure the safety of Plaintiff or the other inmates.  On the other hand, Defendants allege that, because John Doe's sexual-assault allegations were unsubstantiated, and Tuft had "no prior history of discipline problems," they did not infer that the inmates under Tuft's supervision were at risk; thus, the decision to allow Tuft to continue his regular duties was "entirely appropriate."  (Defs.' Br. 21.)

A correctional officer may be held liable under the Eighth Amendment for acting with "deliberate indifference" to inmate's safety only if he knows that the inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.  *See Farmer*, 511 U.S. at 842.  "An Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Id*.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Id*.  Although a prison officials' negligent failure to protect an inmate from an attack does not subject him to liability under § 1983, an official's knowledge of a specific

_____

serious enough to state Eighth Amendment claim).

prior incident from which a reasonable official would infer that a substantial risk existed is sufficient to impose liability under § 1983. *See* **McBride v. Rivers**, 170 Fed. Appx. 648, 655 (11th Cir. 2006) (unpublished).

Resolving all factual issues in Plaintiff's favor, the Court finds that each Defendant, upon receiving notification of John Doe's sexual-assault allegation against Tuft, had subjective knowledge that Tuft posed a substantial risk of serious harm to other inmates. Defendants were aware of a specific incident—John Doe's allegation against Tuft—from which a reasonable official would infer that Tuft posed a substantial risk of harm to other inmates. According to Defendants, John Doe was the first inmate who had ever accused a correctional officer of sexual assault at Scott Prison. When faced with John Doe's unprecedented allegation, however, Defendants did <u>nothing</u> to guard against the possibility of future assaults by Tuft. Although Tuft was transferred to another dormitory after John Doe's allegation, that decision did not constitute a reasonable response to the allegation and the potential threat posed by Tuft to the other inmates. In fact, Tuft's transfer did absolutely nothing to minimize the threat Tuft posed to other inmates, and indeed might not have even been prompted by John Doe's allegation. Furthermore, while Defendants reported John Doe's allegations to their respective superiors, which eventually led to an investigation by the GDOC's Internal Investigation Division, reporting the

allegations, by itself, did nothing to minimize the immediate threat posed by Tuft to the other inmates.  The Eighth Amendment does not require prison officials to absolutely guarantee the safety of the inmates, but it does require officials to take <u>reasonable</u> safety measures, even if such measures ultimately prove ineffective in averting harm.  *Farmer*, 511 U.S. at 844-45.

The Court reaches this conclusion after considering the relevant law, and the lack of viable alternatives available to prisoners who either have been assaulted by a prison guard, or who are in danger of being assaulted.  If one inmate's recent allegation of sexual assault against a prison guard is insufficient to trigger a prison official's Eighth Amendment duty to employ reasonable and affirmative measures to ensure the safety of the other inmates, two or more inmates would almost always must suffer from a predatory guard's attacks before a prison official's Eighth Amendment duty to ensure inmate safety arose, if at all.  Moreover, not every inmate will have a piece of evidence as damning as a semen-stained t-shirt to buttress his sexual-assault claim, so the likelihood of apprehending an officer who leaves behind no physical evidence is even more remote if prison officials do not take an inmate's allegation of sexual assault more seriously from the outset.

Based on the foregoing, the Court concludes that Defendants' knowledge of, and

disregard for, the excessive risk to Plaintiff's safety posed by Tuft constituted deliberate indifference in violation of Plaintiff's Eighth Amendment right to reasonable protection.

**(ii) Was Plaintiff's Right to Reasonable Protection Clearly Established?**

The Court now turns to the second prong of the qualified-immunity analysis. Plaintiff contends that "in the summer of 2002, an inmate's right under the Eighth Amendment . . . to be afforded reasonable measures to guarantee his safety [was] clearly established." (Pl.'s Br. 49.)  Plaintiff further contends that, at the time of the constitutional deprivations, "the unlawfulness of the Defendants' actions against the Plaintif[f] was most definitely apparent."  (Id. at 50.)

A constitutional right is "clearly established" if "'[t]he contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *McElligott*, 182 F.3d at 1260 (quoting *United States v. Lanier*, 520 U.S. 259, 270 (1997)).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "Officials can still be on notice that their conduct violates established law even in novel factual circumstances," and there is no requirement that previous cases be "fundamentally" or even "materially" similar.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

In fact, "general statements of the law" are capable of giving clear and fair warning to prison officials even where "the very action in question has [not] previously been held unlawful." *Anderson*, 483 U.S. at 640.

Generally, "[w]hen officials become aware of a threat to an inmate's health and safety, the Eighth Amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection." *Hughes*, 894 F.2d at 1537. Although a prison official's negligent failure to protect an inmate from attack cannot establish his liability under § 1983, an official's deliberate indifference to a *known danger* and his failure to intervene offends "evolving standards of decency," and violates the Eighth Amendment. *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)) (emphasis added).

The Court's research has not revealed a case in which the Supreme Court, Eleventh Circuit, or the Supreme Court of Georgia held that a prison official has a duty under the Eighth Amendment to protect prison inmates by removing a guard accused of sexual assault from the general inmate population pending the outcome of an investigation. Nevertheless, in light of preexisting law addressing a prison official's duty to take reasonable measures to guarantee inmates' safety, the unlawfulness of Defendants' failure to employ any protective measures whatsoever upon receiving notice of John Doe's sexual-assault allegations was apparent at the time Defendants were notified of Tuft's

31

assaults.

Based on Plaintiff's version of the facts, the Court concludes that Defendants' collective failure to take any action to protect the inmates from Tuft once they learned of John Doe's allegation constituted deliberate indifference to a *known danger* of harm, in violation of Plaintiff's clearly established right to protection under the Eighth Amendment. Accordingly, Defendants Scroggy, Jones, McElhenney, Nicholson, Evans, Holsey, and Knight are not entitled to qualified immunity from, nor summary judgment on, Plaintiff's failure-to-protect claim.

## V.      CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (doc. 34) is hereby **GRANTED IN PART**, and **DENIED IN PART**.  Defendants are entitled to qualified immunity from, and summary judgment on, Plaintiff's mental-health claim because Plaintiff did not have an Eighth Amendment right to mental health treatment *immediately* following his sexual-assault allegation, and because, even if such a right existed, it was not clearly established at the time of Defendants' alleged constitutional violations.

With respect to Plaintiff's failure-to-protect claim, Defendants Ray Stanelle and Johnny McCurry are entitled to summary judgment.  The remaining Defendants:  Gene

Scroggy, Aubrey Jones, Tom McElhenney, Gloria Nicholson (n/k/a Gloria Chester), Captain Carl Evans, Sergeant Dennis Holsey, and Sergeant Dennis Knight are not entitled to qualified immunity from Plaintiff's failure-to-protect claim; therefore, these Defendants' summary-judgment motion with respect to this claim is hereby **DENIED**.

SO ORDERED, this 23rd day of October, 2006.

**/s/ Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/jab